Mr. Clerk, will you call the next case, please? 3-0707-63 In re Marriage of Bruce Hattemer Challenge Dr. McCarthy vs. Joanne Hattemer Athlete, Ross, Jr. Mr. McCarthy? Sorry, I didn't hear you. Mr. McCarthy, are you ready? Mr. McCarthy, you have filed a motion to supplement the record. That's correct. We have agreed to allow that. That's correct. We have agreed to allow the motion to supplement the record. Oh, I'm sorry. I'm hearing a lot of heckles, so I can't... No, no, no. Mr. Shugan, if I pronounced that correctly? Yes. You looked up, and I didn't know if you'd heard me, so that's the reason I repeated it. Thank you. Okay, you may commence your argument. Mr. Shugan, my name is Jeff McCarthy. I represent Bruce Hattemer, who is the petitioner and appellant in this case. This case is a simple marriage involving complex issues in an overly complicated divorce proceeding. The appeal before you involves eight specific issues. Those eight issues revolve around the issues of property division and maintenance. From an initial standpoint, the first issue that we had with the ruling of the trial court had to do with the issue of contribution to mortgage and utilities. During the course of the proceedings, and understand this case took a grand total of about three years to get from start to finish, there was filed a petition on behalf of Joanne, who's responding, for contribution by Bruce to certain household expenses, including a mortgage and utilities and the like. On January 4th of 2005, there was an order entered. The order specifically said, Bruce shall assume financial responsibility for one half of the following marital expenses. Mortgage, SBC, Krause, cable, food, repairs, and upkeep of the house. Cleaning supplies, extraordinary medical expenses of the parties' children, Angela and Michael, college visits for Angela, and one quarter of the following expenses, NICOR, gas, water, ComEd, electric. Joanne Hattemer shall assume full financial responsibility for Michael's guitar lessons. This order was entered in connection with a petition brought by Joanne. Subsequent to that order, both parties testified that they both paid their relative shares pursuant to the terms of that order. Until eight months later, when Joanne Hattemer moved out of the marital residence. She didn't file any petitions for relief from the motion. She didn't file anything relating to a necessity that the motion only required her, or the order only required her to pay while she was resident in the house, but she moved out of the residence. There wasn't any order requiring her to move out of the residence. It was just of her own doing. She testified that the move terminated her obligation to contribute. In fact, she testified in various instances that she understood it was her obligation. She understood that there was the obligation to contribute, but she thought that her no longer living under the same roof as Bruce and the children no longer required her to contribute. Fortunately, Bruce was required to pay for the next 33 months on that order 100% of all of those expenses. Bruce testified that Joanne's contribution would have been $1,093 per month. Now in consideration of that order, Bruce filed a petition for rule to show cause, asking for essentially two bits of relief. Finding of contempt with regards to Joanne for not complying with the terms of the order, and a reimbursement. But the order didn't order her to pay one half of anything. It just ordered her to make the payments for the guitar lessons, right? Well, the order specifically required Joanne, by name, to pay 100% of the guitar lessons. But that order doesn't exist in a vacuum. That order is in relation to specific pleadings brought by her, suggesting, I need Bruce's help to pay the mayoral expenses. So the fact that the order only recites Bruce's name and requires Bruce to pay 50%, Joanne feels that that means that she's not required to pay the other 50%. Well, she can say that, but you can also review the testimony. And by her own testimony, she complied with the terms of the order for eight months. She paid 50% of all of the listed. She paid 75% of the NICOR, gas, water, and ComEd. And when she moved out, she stopped paying. Now, there was nothing in the order that said you only pay that amount while you continue to live under the roof. It was an order that was obligating her to pay just as much as it was obligating Bruce to pay. They both paid 50%. This is a lawsuit between two parties. There's a petitioner and respondent. When one asks for relief and they get 50%, the order requiring the other 50% would be as it relates to Joanne's obligation. And what we're asking... What authority do you cite for the proposition that an order is entered against one party directing them to pay one half of a mortgage, but that by implication requires the other party to pay the other 50%? Well, I cite a number of cases, Judge. I cite two specifically. There's a case called Pope v. Pope and Standard Savings and Loan Association of Chicago, which is a 7-0-3-935 First District from 1972, which essentially acknowledged that orders don't exist in that vacuum, that they exist in the context of the pleadings that brought them before the court. And more directly, In re the Marriage of Blair, which is 317-0-3-853, and that's a First District 2000 case, which unequivocally stated the effect must be given not only to what is expressed, but what also is unavoidably and necessarily implied in the judgment or decree. Now, we only have litigation involving two parties. And when one party brings a petition for relief, and that relief is the other pay 50% of bills the first party is asking for contribution to, the only unavoidable conclusion would be party one pays the other 50%. Because it wasn't an obligation to pay 100% of ComEd, 100% of NICOR, and Joanne paid 100% of Prowlis and 100% of Cablebook. It was Bruce paid 50%. Bruce paid 25% of others. So from the standpoint of where that order sits, that order sits as a bilateral obligation for both parties to pay the percentages set forth in the order. Now, in recognition of that, Bruce asked that Joanne be held in contempt. But from the standpoint of where we are in the proceedings, where we were at the time of trial, Bruce wasn't looking for Joanne to be thrown in jail or anything along those lines. He just wanted acknowledgment by the court of the fact that Joanne didn't pay so that his share of the marital estate could include a reimbursement from Joanne for what she hadn't paid for those 33 months, which ties in similarly to the argument regarding the issue of child support. Again, during the course of these proceedings, Joanne filed a petition for temporary relief. In fact, she filed a petition for temporary relief regarding child support prior to the petition for relief regarding marital contribution. The petition for relief regarding child support essentially ordered Bruce to pay $1,000 a month in child support to Joanne. A notice to withhold was issued to his employer, and about a year later, the petition for dissolution was voluntarily dismissed because the parties had reconciled. Well, about 60 days after that, the parties were no longer reconciled,  and without additional order of the court, she issued the order for withholding again to his employer, who again started withdrawing $1,000 a month from his earnings. Now, subsequent to that, Joanne filed a petition for sole possession. It was framed in the terms of a petition for temporary relief, but it was a prayer for sole possession of the residence. And then about six months later, she filed what we just talked about, the order regarding marital expenses. The crux of this issue was in September of 2005, Joanne moved out. She moved into an apartment in Diamond. No orders of the court requiring her to do so, no pleadings asking for one or the other to move out of the house. She moved out of her own accord. But she left the minor child, Michael, with Bruce. The entire time, Bruce was continuing to pay child support to Joanne while she was living alone in this apartment in Diamond. Approximately two months later, Bruce filed a petition seeking to terminate that child support obligation. And unfortunately, because of the nature of this particular courtroom in Will County, this courtroom went through three judges in a matter of about a year and a half. And what happened was, when the petition was originally filed at a pretrial, the court said, hold that for the trial, which will be in about 30 days. We'll deal with it as a matter of it being part of the trial. In the meantime, new counsel came on for Joanne. The case was continued. A new judge was assigned to the case. That case went on for about eight months with Judge Petrangaro. Then she was reassigned. Then Judge Polito came in. So it went from Judge Petrangaro to Judge Polito. And all of those periods of time involved a bit of wrapping up for the court. Now, in the meantime, since September of 2005, Joanne's been living in the apartment in Diamond alone. Michael's been living with his father. Bruce has continued to pay child support to the tune of $1,000 a month to Joanne. Approximately two months before the trial was scheduled to begin, we finally got an order from Judge Polito terminating the notice to withhold because of the acknowledgment that Michael was with his father. But that doesn't mean that Bruce isn't now entitled to, number one, a reimbursement for that child support paid. Because the child support that was paid didn't benefit Michael. It benefited Joanne. I thought there was something that the child support essentially rolled over at that point into maintenance. Well, what happened was that during the initial pretrial with Judge Allen, when he said hold that for the trial date in, I think it was 45 days, I'm going to treat it as temporary maintenance until we get the trial. Well, 45 days became 30 months, and it just continued to accrue. Now, if— So it was temporary maintenance or it was child support? There was no order suggesting that it was. Just this oral statement by the judge. Right. And there was no order saying that it was temporary maintenance. The only order that existed was that this $1,000 a month was temporary child support. And Joanne admitted that she wasn't raising Michael. In fact, I think in her own brief she acknowledged that their relationship had completely fractured. She wasn't even talking to her son at that point. Yet she was continuing to receive $1,000 a month that came out of Bruce's pocket that could have been used to maintain Michael. It wasn't. It was used to maintain Joanne. Now, if Judge Pulido in his ruling had determined, I'm going to determine that that was temporary maintenance, and I'm going to suggest that that for the time period was temporary maintenance, he should have put it in his ruling. But he avoided the question entirely. So as it stands now, based upon the ruling he gave, it was temporary child support payable for a child that wasn't residing with the mother. And in that context, what we're asking for is a reimbursement for the monies that was paid. In conjunction with that, we're also suggesting that the court review the fact that no child support was ordered. At the same time Bruce sought to terminate the child support, he asked for an order requiring Joanne to pay child support. Now, the evidence is clear. Joanne was making, over that three-year period, she averaged almost $45,000 a year. She had significant income. She had more income than her bills required. She was more than capable of paying child support out of that income, but didn't. She made not a single payment for the benefit of Michael. She did suggest at some point that she had made payments for the benefit of Angeles College and the like. But in truth, what she had paid was for herself to take a trip to Pittsburgh to watch a football game with Michael. What she had paid was for acne medicine. She hadn't paid anything. What she had paid was for a college prep testing course that really she paid for when she was receiving child support from Bruce when they were both in the house together. So, ultimately she really didn't pay any of her own money to Bruce at all for the benefit of Michael. You didn't ask for support? Yes, we did ask for support in the context of that motion. We asked that statutory support be determined at that time. Okay. Finally, there's another issue that in the context of this proceeding, the court determined that Joanne had made specific withdrawals from the Merrill Estate. She made withdrawals from the children's Prairie Trail Credit Union accounts that had been maintained. She suggested that she had paid $50 a week towards this account for the benefit of the kids. But she also agreed that the kids' gifts and graduation money and stuff had been deposited in these accounts. Now, right after the reconciliation when the initial case was dismissed, probably about two weeks before the case was reinstated, Joanne went to the bank and withdrew pretty much all of the funds. She didn't consult with anybody on it. She testified that she did it in order to prevent Bruce from using it as a down payment on a house. Ultimately, that money was Merrill. That money should have been returned to either Bruce or it should have been returned to the kids. And she testified that she used it. She used it to pay her former attorney. She used it to live on when she was receiving $47,000 a year plus $1,000 a month in child support. Far in excess of any income expense affidavit she tendered to the court. She also suggested that she had used $6,000 out of her own account to go to the movies and go to dinner with friends. All of those amounts were ignored by Judge Pulido when he ruled. He didn't make any determination as to whether or not Bruce was entitled to reimbursement for those amounts. And I think, obviously, those amounts consisted of dissipation from the Merrill estate. Those amounts should have been added back in when we made the ultimate determination and the ultimate division of property. She also testified that she had refused to use Bruce's health insurance. Why, I don't know, but she said she wasn't going to use his health insurance. So she incurred $252 a month during the separation in additional unreimbursed charges that ultimately existed as a dissipation against the Merrill estate. Thank you. Thank you, Mr. McCarthy. Mr. Shugan. Thank you. My name is Ross Shugan on behalf of the Appleby, Joey, and Hattimer. Thank you for giving us this time today. In response to some of the points that Mr. McCarthy argued in this oral argument, first of all, with respect to the order pertaining to household expenses, it's clear and unambiguous that that order only ordered my client to contribute the payment of Michael's guitar lessons. The order was specifically drawn, and it said that Mr. Hattimer was to pay a certain portion of mortgage, a certain portion of utilities. It did not order my client, Joey Hattimer, to pay for those particular items per the terms of that order. It should be noted that at the time of the entry of that order, Mr. Hattimer was not only present in court and approved the order, as noted in my brief, but was represented by counsel. And the record would also show that he never came into the court at the trial court level and requested a modification of the order. Had he done so, he may have gotten certain relief. He never did.  Now he's coming in and saying, oh, the order really meant that Joey Hattimer should have paid half the mortgage, three-quarters of the utilities, under the terms of the order. The order is specific. There's no ambiguity. It doesn't order my client to pay those items. So his claim on that, I think, should fail. With regard to the argument on the child support, the temporary child support order, first of all, as argued by me at the trial court level and noted in the brief, the petition that Mr. McCarthy refers to that was purportedly filed on behalf of his client was in the court file. It's unsigned. It does contain a stamp. It's not the normal time stamp. There is no notice of filing or proof of service of that petition anywhere in the record. The petition that he refers to is not referenced in any court orders that occurred at the trial court level, like saying petition filed in open court, petition filed. The only reference was made, the only reference, there was an order in March when the order of withholding was terminated. Prior to that, there was never any reference to that order. Now, it's clear under the standard of law that even if the court finds that it was properly filed, even if this court so finds, that the trial court has the discretion, a great deal of discretion, in determining whether or not any kind of retroactivity or retroactive relief should be granted. And I believe that Judge Polito's decision was not an abuse of discretion. Again, if you look, this is not a case, Mr. McCarthy refers to the fact that the petition was filed, I think, in November of 2005, and a year and a half went until the trial date. But again, if you look at all the intervening orders in the file, in this record, there's never a reference to this petition is continued for hearing. There's no reference anywhere in the record, there's no finding, there's no evidence in the record that Mr. Hattemer ever requested any hearing on the petition that he purportedly filed at any time prior to trial. Or maybe March of 07 when the order was terminated in withholding those. So all this time goes by and Bruce Hattemer makes not an iota of effort to seek any kind of hearing on that petition. No evidence in the record that my client delayed it, no order saying on motion of Joanne Hattemer, the petition for child support or to terminate and to order her to pay child support is continued to such and such a date. There's nothing of that in the record because they never noticed it up, they never sought a hearing on it. So Judge Polito was perfectly, I believe in the purview as authority to not grant the retroactivity. I would point out that Judge Polito did grant some retroactive relief to Bruce Hattemer on some items contained in that petition, namely on items pertaining to the child Angeles college expenses at the University of Pittsburgh. The judgment for dissolution court will note by looking at it that it did order my client to make some contribution toward past years of Angela's attendance. So it's not like Judge Polito just ignored their petition. He did give some retroactive relief and the fact that he didn't give retroactive relief on the child support was not an abuse of discretion. Can I ask you a question about that? Let's say that it is determined that it was properly filed. What would be your basis for saying that it was proper for her to have kept the 465 biweekly over a period of 18 or so months when she didn't have the child? She also had no obligation to make any expenses at the marital residence or pay any of those debts. So now she has non-taxable income in addition to her income that she's keeping for benefit of a child that she's not paying anything for. My response to that would be that, as was discussed briefly by Mr. McCarthy in his argument, the monies that she was receiving, I believe, would have been construed as akin to temporary maintenance. There was a citation in my brief of some testimony by Mr. McCarthy's client, Mr. Hanemer, at the trial. He was talking about filing some FAFSA forms relative to college aid for one of the children. I don't recall which, but he admitted submitting what we might generously call a pro forma or fictitious tax return in which he reduced in this pro forma or fictitious tax return his income by $12,000 or $1,000 a month, which is the same amount that the temporary child support was in the order because, and this is quoted in my brief, that everybody knew that it could be construed as maintenance. So that would be my response, that in effect it was construed as maintenance, so I don't think she received the windfall. So both parties thought that was maintenance, or I'm not sure how we're construing that, and how does that relate then to the three years of maintenance that followed? Well, are you talking about what was ordered in the judgment for dissolution of marriage? Well, I mean, the trial court could order temporary maintenance, and then in conjunction with the trial and the judgment for dissolution of marriage, the court could order permanent maintenance or reviewable maintenance. So the order that Judge Polito ultimately ordered in the trial was $750 a month maintenance, I believe reviewable in three years. But I don't think that would be in any way undercut by the fact that she may have received monies which could be construed as maintenance during the pendency of the case. Do we know if she paid taxes on that, or he deducted that from his return? I don't believe she did. I think the tax, the exhibits will be furnished to your honor. I mean, if we don't, we don't know. I don't recall, but the tax returns of my client are in there, and I think Mr. Hanneman's tax returns will be in the record as well. Regarding the dissipation claim that was spoken of on the part of Mr. McCarthy, a couple things. One, there was no notice of claim or notice of intent to seek dissipation that was filed in the case by Mr. Hanneman, so there was no shifting of the burden by Mr. Hanneman to Ms. Hanneman on the issue of dissipation. With respect to the merits of the claim of dissipation, specifically pertaining to some credit union accounts or credit union bank accounts from which my client made withdrawals, obviously she did not deny making the withdrawals. Again, as argued in my brief, these withdrawals occurred during a period of time that there was an order entered dismissing the case because the parties were attempting a reconciliation. Under the O'Neill case, one of the prerequisites for finding of a claim of dissipation is that the alleged dissipation occurs after the marriage has been irretrievably broken. By definition, there was a court order entered in 2004 that indicated the parties were attempting a reconciliation. While it's true that they didn't ultimately reconcile, during that period of time, I think that it could have been construed by the trial court that the monies taken at the time, that the timeline of this did not warrant the fact that the marriage was irretrievably broken at the time it occurred. In addition to that, my client did testify that she utilized some of the monies for living expenses. Now, while her explanation in the record was not tremendously specific, but again, since there was no, it's not like there was claim for dissipation pending for months and she had time to respond to it. She responded to this as it was raised and I believe gave a reasonable response. Regarding one of the other items of dissipation that was talked about by Mr. McCarthy, the occurring of this $250, $252 a month related to medical, there was testimony in the record that my client had put in a claim or claims for payment or reimbursement of medical expenses that she incurred during the time that Mr. Gadamer had gotten the reimbursement for that claim or claims and had not forwarded or reimbursed my client for it. And based upon that, I don't think her conduct in that area should be considered dissipation. Thank you very much. Well, thank you, Mr. Truman. And Mr. McCarthy, any rebuttal? A couple things. First of all, counsel suggests that because the order that determined the percentage interest in the marital obligations didn't list Joanne's name as it relates to the other $50 and the other $75, that there's a suggestion that that means that the order itself is unclear and unambiguous. I think that the order itself is clear and unambiguous. By suggesting that Bruce should pay 50% on a motion brought by Joanne, the clear and unambiguous portion of that order is that Joanne is continuing to pay the other 50% because it's a motion to contribute, not a motion to pay. It's a motion to contribute. So the contribution comes in the form of additional sums to help her make each payment 100%. From the standpoint of the order, Judge, I don't think that the fact that Mr. Hadamer not signing the certification makes the petition that he filed questionable in any way. The reality of it is I think that's an affirmative defense that should have been pled by Mrs. Hadamer. Mr. Hadamer was capable at any time of signing the certification and acknowledging the existence of the petition. I think, more importantly, that the existence of the petition is acknowledged by Joanne Hadamer. It's acknowledged when she testifies, or Mr. Shugan, in fact, makes an offer of proof during the trial where he suggests that in the conduct of that pretrial, Mrs. Hadamer was under the impression that the temporary child support order was going to be treated as temporary maintenance until we got to trial. Now, the problem with her suggesting now that that's what I intended, that's what I believed it to be, is I don't think either party knew what it was. And that's shown by your review of the record because Bruce didn't take a deduction on his taxes and she didn't claim his income. So I think that's even more followed up by the fact that we talked about this pro forma tax return that he filed with his FAFSA. And he reduced his income by $12,000. I think when you review the transcript, Mr. Hadamer testified that I didn't know how to deal with that $12,000. My job was to get a financial aid form in on behalf of my daughter, and that's the best I could come up with that would reduce my income, that would make her eligible for financial aid. But I don't think either party knew how to treat that payment. All we know is it was paid, and Mrs. Hadamer never paid it back, nor did she ever pay her 20% for Michael. From the standpoint of the dissipation issue... If I can back up just for a second. Sure. Your client didn't appeal the issue of the award of maintenance in the divorce, so I guess I'm assuming... No, he did. He did appeal the award of maintenance. It's... Oh, excuse me. We haven't gotten to that. It's number eight, I believe. It's the eighth one. Okay. And the appeal of the maintenance with regard to number eight was the recognition that Joanne was making $47,000 a year. She was 10 years younger, had essentially 15 years left on her viable working life, and was more than capable of affording the existence that she was enjoying. In fact, she testified that she was enjoying a much more lucrative, much more higher lifestyle than she had ever enjoyed during the marriage. And that was based upon her $47,000 a year, her bonus, and Mr. Hadamer's $1,000 a month in temporary, and now $750 a month in reviewable for 36 months. But back to the issue of dissipation, I don't think there's any necessity here to have filed a notice and shifted the burden because I think the evidence was clear. She testified to it essentially in the first half hour of the trial. She admitted, I was depressed, I wanted to go and buy myself some things, so my bank account went from $11,000 to $6,000 over the last five months. That's less than one minute. And she also testified that she used those funds to pay for her nights out, her dinners with friends, her nights at the movies. She didn't use them for any marital purpose, and I don't think there's any argument from either party that the marriage had suffered an initial breakdown long before that. From the standpoint of the withdrawals, my concern with Mrs. Hadamer's argument with regards to her withdrawals from the kids' accounts is this. She's suggesting we were exploring reconciliation, I dismissed my petition, I withdrew the money during the dismissal, and two weeks later I reinstated the petition. What that essentially suggests is that she's manipulated the process and said, okay, what I'm going to do is I'm going to tell Bruce we're going to get back together, I'm going to take everything out of the accounts, and then I'm going to refile two weeks later, and he will have no recourse. I think obviously their marriage had been irretrievably broken. The fact that they were, quote-unquote, exploring reconciliation doesn't mean that they reconciled, because in fact six weeks later she filed to bring the case back up. So I think ultimately I think it's clear that she dissipated the marital estate and that Mr. Hadamer is entitled to reimbursement. Thank you very much. Thank you, Mr. McCarthy, and thank you both for your argument today. We will take this matter under advisement and get back to you with the results.